Byron MAY, Appellant (Plaintiff),

v.

**DEPARTMENT OF NATURAL RE-SOURCES, STATE OF INDIANA,** Appellees (Defendants).

**No. 29A02–9001–CV–62.**

Court of Appeals of Indiana, Second District.

Jan. 23, 1991.

Frank B. Harshey, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Brenda Franklin Rodeheffer, Deputy Atty. Gen., Office of Attorney General, Indianapolis, for appellees.

BUCHANAN, Judge.

## CASE SUMMARY

Plaintiff-appellant Byron May (May) appeals from his demotion by the Indiana Department of Natural Resources (DNR), claiming the DNR failed to promulgate rules and regulations in accordance with statute, that the DNR failed to file a statement of reasons with the State Personnel Department, and that the evidence was insufficient to support his demotion.

We affirm.

## FACTS

The facts most favorable to the trial court's judgment reveal that May was employed by DNR as a Conservation Engineer Supervisor IV. May was the chief of the Planning Section of the Engineering Division of DNR and was second in command of the Engineering Division under Carl North (North). Paul Greenwalt (Greenwalt) was a Deputy Director of DNR and was North's immediate superior.

In October, 1986, Greenwalt decided to remove May from his managerial position, and demote him to the position of Conser-

vation Engineer III. Greenwalt felt that May was inadequate as a manager, but because May was a good engineer, Greenwalt wanted to keep May in the DNR.

In a letter dated November 3, 1986, Greenwalt outlined the reasons for his decision to demote May. The letter provided, in pertinent part:

"In your position as head of the planning and design section, it was your responsibility to effectively provide leadership, set a good example and demonstrate sound management practices. Unfortunately, you failed to do this.

As explained previously, I was very concerned about several aspects of your performance, including the important role as second-in-command of the Division of Engineering. In this role, you were to direct and manage the division in Carl's absence and provide, at all times, sound leadership for the many employees within the Division.

Your lack of a sense of urgency about proposed, planned and on-going engineering projects reflected unacceptable behavior. In addition, under your own initiative, you developed an adversary posture with other employees of the DNR and even with outside engineering firms, concerning engineering projects. As I have explained on numerous occasions, cooperation and a helpful attitude with other sections of state government, and the public, is paramount to the success of an engineering project.

On more than one occasion, you missed deadlines for submitting material to the division director or to me. Included in this unacceptable practice was the recent request by me for a capital construction priority listing. This item, prepared by you, was several months late in reaching my desk.

You were counseled on several occasions about unacceptable job performance. You had ample time and opportunity to improve job performance. Unfortunately, you chose not to change your work performance and this is why divisional

duties and responsibilities were reassigned."

*Record* at 1225.

After being informed Greenwalt was considering demoting him, May was given the opportunity to discuss the action with the Director of DNR before the decision was finalized. The director decided to follow Greenwalt's recommendation and demoted May effective November 16, 1986. May appealed his demotion to an administrative law judge.

The administrative law judge decided that the DNR had failed to promulgate rules and regulations concerning the employment of professional engineers, contrary to the provisions of Ind.Code 4–15–3–3 (1988), and that May's demotion was therefore improper. The administrative law judge also determined that the evidence was insufficient to establish May's performance warranted demotion. The administrative law judge focused on the evaluations May had received in the years prior to his demotion and concluded DNR had failed to adequately advise May that his performance was deficient.

The administrative law judge recommended that May's demotion be vacated and that he be reinstated. The DNR filed objections to the administrative law judge's decision, and the Director reviewed the administrative law judge's findings of facts and conclusions of law. The Director upheld May's demotion and issued his own findings and conclusions.

In support of his decision to uphold May's demotion, the Director made the following determinations:

"36. The reasons referenced in Finding 33 are supported by the evidence. Illustrative of this evidenciary [sic] support is the following:

(A) The Deputy Director spoke with May and Carl North in the doorway to May's office in the fall of 1985 and told them changes were needed to the management of the Division. Neither May nor Carl North undertook an initiative to respond to this informal discussion.

(B) At the insistence of the Deputy Director, a meeting was conducted in

January 1986 with the staff of the Division (including May) to discuss performance difficulties. The Director and the Deputy Director "talked for some time then about a sence [sic] of urgency, about a service attitude" that the Deputy Director wanted changed, but May was unresponsive.

(C) John Fleck, Director of Public Works, spoke with the Division, including May, concerning problems which had arisen because changes were made without communicating the changes through a designer.

(D) One of May's administrative responsibilities was to develop a priority listing for DNR projects as soon as practicable after budgetary decisions were made by the General Assembly, but he was chronically delinquent in performing this responsibility.

(E) May failed to function in concert with the landholding divisions of the DNR and often projected an attitude with respect to those divisions which was adversarial rather than service-orientated.

(F) May either could not or would not view the broader engineering planning and design needs of the DNR and frequently became immersed in minute details. He would lose sight of the overall program within the DNR and would fail to deal with large issues.

(G) Failures by May to establish priorities and to delegate responsibilities to his staff contributed to delays in the development and completion of major capital projects.

37. Good cause exists for demoting May and removing from him responsibilities for management, supervision and administration."

*Record* at 151–52.

May sought judicial review of the Director's decision, and on October 31, 1989,

the trial court affirmed the Director's action.

## ISSUES

May raises three issues for our consideration, which we restate as:

1. Whether DNR was required to promulgate rules and regulations in accordance with IC 4–15–3?

2. Whether DNR complied with 31 IAC 1–10–1 by filing a statement of reasons for May's demotion?

3. Whether the evidence was sufficient to support May's demotion?

## DECISION

ISSUE ONE—Was DNR required to promulgate rules and regulations?

PARTIES' CONTENTIONS—May argues that DNR was required by statute to promulgate rules and regulations establishing a merit system for the professional engineers it employed, and that DNR lacked the authority to demote him because it failed to issue the required rules. DNR responds that the statute is discretionary and that it was not required to promulgate regulations.

CONCLUSION—DNR was not required to issue rules and regulations.

May's position is that IC 4–15–3–3, which creates a merit system for professional engineers employed by the State, and which has never been construed by the courts of this State, mandates the promulgation of rules and regulations necessary for the establishment of a merit system.[1] Two statutes are relevant to our discussion:

IC 4–15–3–3 provides:

"Each department, commission, bureau, board, or division of the state of Indiana in which there is an engineering service, as defined in this chapter, shall be em-

---

1. Within the ambit of State employment parlance, "merit" employees are those employees in "state service" as defined in IC 4–15–2–3 (1988). "Merit" employment, in this context, is regulated in 31 IAC 2. DNR employees are not in "state service" but are generally considered in "non-merit service" as defined in 31 IAC 1–2–1, promulgated by the State Personnel Department under the authority of IC 4–15–1.8–8. Our discussion of DNR engineers as "merit" employees relates solely to the merit system established in IC 4–15–3–1, and should not be confused with the "merit"/"non-merit" distinction generally referred to in the context of State employment.

powered to prepare and promulgate such rules and regulations not inconsistent with the terms of this chapter *as it may deem proper* to govern the application of this chapter to its engineering service. Such rules and regulations shall govern the requirements of said department, commission, bureau, board, or division with respect to qualification, classification, salary schedules, appointments, promotions, and transfers, and such rules and regulations shall contain therein no reference, direct or otherwise, to the political, religious, racial, or fraternal affiliations of such employees or prospective employees."

(Emphasis supplied).

IC 4–15–3–5 further provides:

"The provisions of this chapter shall govern the qualification, classification, and remuneration of all registered professional engineers in the engineering service of all departments, commissions, bureaus, boards, and divisions of the state of Indiana. As soon as possible, and in any event not later than August 7, 1941, each department, commission, bureau, board, or division *shall cause to be prepared the rules and regulations authorized in this chapter by it to be made.*

(Emphasis supplied).

■ As IC 4–15–3–3 empowers the DNR to issue rules and regulations "as it may deem proper," it is reasonable to assume that the promulgation of rules and regulations is entirely within the DNR's discretion.

■ May points to that part of IC 4–15–3–5 which provides DNR "shall cause to be promulgated ..." as support for his contention. Generally, when the word "shall" appears in a statute, it is construed as mandatory rather than directory unless it appears clear from the context or the purpose of the statute that the legislature intended a different meaning. *United Rural Elec. v. Ind. & Mich. Elec.* (1990), Ind., 549 N.E.2d 1019.

The term "shall" has often been held to be the directory, e.g. when the statute fails to specify adverse consequences (as here). If "shall" does not go to the essence of the statutory purpose, a mandatory construction would thwart the legislative purpose. *Matter of Middlefork Watershed Conserv.* (1987), Ind.App., 508 N.E.2d 574; *Hancock Co. R.E.M.C. v. City of Greenfield* (1986), Ind.App., 494 N.E.2d 1294, *trans. denied.*

■ Our examination of IC 4–15–3–5 leads us to conclude that "shall" was used as a direction, and not as a mandate. There are no consequences specified for the failure to promulgate rules and regulations. The essence of IC 4–15–3–2 is that employment decisions concerning engineers be made according to merit and fitness, and not on the basis of race, religion, color, sex, national origin, or ancestry. IC 4–15–3–2. A construction of "shall" as mandatory would certainly conflict with the obviously discretionary provision of IC 4–15–3–3. It should also be said that statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious statutory scheme. *Sanders v. State* (1984), Ind., 466 N.E.2d 424; *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459, *trans. denied.* The only harmonious construction of these two statutes would require that "shall" be construed as directory.

So May's position grounded on his interpretation of IC 4–15–3–5 as absolutely requiring issuance of rules and regulations, rests on quicksand as we view it.

■ It should be added that May does not assert his demotion [2] was based on any grounds other than merit, and he did not contend that he was denied due process. The record demonstrates that the decision to demote May was based solely on merit and fitness, and the record amply shows May was given procedural due process. He was notified of the pending personnel action and given a chance to respond before the decision was made; he was given a

---

**2.** The Director determined that IC 4–15–3–2 required reasonable cause for any personnel action taken against a professional engineer.

*Record* at 150. That determination has not been challenged.

written statement of reasons; he had the opportunity to appeal the decision to an administrative law judge, had that result reviewed by DNR's Director and had the Director's decision judicially reviewed by the trial court.

As May made no claim that his demotion was a substantive violation of the act, even if the DNR was required to promulgate rules and regulations, it is difficult to see how May could have been prejudiced.

The Director and the trial court quite properly concluded that May's demotion was not invalidated by the lack of rules and regulations.

ISSUE TWO—Did DNR comply with 31 IAC 1-10-1?

PARTIES' CONTENTIONS—May claims that DNR never filed its reasons for demoting him with the State Personnel Department, and therefore his demotion was not proper. DNR replies that the evidence is sufficient to establish the statement of reasons was filed.

CONCLUSION—DNR properly filed its reasons for demoting May.

May says his demotion was ineffective because DNR did not comply with 31 IAC 1-10-1, and that he is due back pay with interest as well as attorney's fees and litigation costs in accordance with Ind.Code 22-2-5-2 (1988). The evidence, however, establishes DNR complied with the rule.

31 IAC 1-10-1 provides: "An appointing authority or his designee may demote an employee by filing a statement of reasons with the [State Personnel] Director and the employee concerned."

The scope of judicial review of the decisions of an administrative agency is limited. *City of Indianapolis v. Ingram* (1978), 176 Ind.App. 645, 377 N.E.2d 877. In an "appeal" from an administrative decision, the trial court can only determine whether the decision is arbitrary, capricious, an abuse of discretion or in excess of statutory authority, and whether the decision is supported by substantial evidence. *Department of Fin. Insts. v. State Bank of Lizton* (1969), 253 Ind. 172, 252 N.E.2d 248; *Thomas v. Review Bd.* (1989), Ind.

App., 543 N.E.2d 397; *Johnson County Planning Comm'n v. Ramshead Corp.* (1984), Ind.App., 463 N.E.2d 295.

Administrative findings of fact are not reversed unless it conclusively appears the evidence upon which the decision was made was devoid of probative value or so proportionately inadequate that the finding could not rest on a rational basis. *Calvary Temple Church, Inc. v. Paino* (1990), Ind. App., 555 N.E.2d 190; *Dane Trucking Co. v. Elkins* (1988), Ind.App., 529 N.E.2d 117, *trans. denied.* We will not reweigh conflicting evidence or judge the credibility of witnesses. *Paino, supra; Elkins, supra.*

May's argument seems to be that the failure of DNR to produce a file-stamped copy of the statement of reasons for his demotion requires a determination that the statement was never filed. His argument is against the record. There is abundant evidence there demonstrating the statement was filed. The fact that a copy could not be found at the State Personnel Department was merely evidence for the trier of fact to consider.

The record shows that Greenwalt testified he prepared the statement and gave a copy of the statement to his secretary to send to Keith Beesley (Beesley), at the time the Deputy Director of the State Personnel Department. *Record* at 1135-6. Greenwalt's secretary testified she sent the statement to the State Personnel Department. *Record* at 1060-1. Beesley testified the department did receive the statement, and observed this was evidenced by the fact the computer section had recorded the demotion. *Record* at 937-9.

Because we do not reweigh evidence, *Paino, supra; Elkins, supra,* we must conclude the evidence was sufficient to support the finding that the statement was filed with the State Personnel Department and that DNR complied with 31 IAC 1-10-1. As May was properly demoted, we need not address his contentions concerning back pay and attorney's fees pursuant to IC 22-2-5-2.

ISSUE THREE—Was May's demotion supported by sufficient evidence?

PARTIES' CONTENTIONS—May claims that the evidence was insufficient to support his demotion because there was no evidence that he was on notice that his performance was deficient, and therefore the evidence of his deficiencies cannot be used to support his demotion. DNR retorts that the record contains more than sufficient evidence that May was aware that DNR was not satisfied with his work.

CONCLUSION—May's demotion was proper.

In connection with the review of a decision to demote a State Employee, this court in *Natural Resources Comm'n v. Sullivan* (1981), Ind.App., 428 N.E.2d 92, articulated the proper focus of our inquiry:

> "In determining whether an administrative decision is supported by substantial evidence, the trial court must examine the whole record to determine whether 'the agency's decision lacks a reasonably sound basis of evidentiary support. *See Universal Cameral Corp. v. NLRB,* (1951) 340 U.S. 474 [71 S.Ct. 456, 95 L.Ed. 456].' *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* (1976) 169 Ind.App. 652, 663–65, 351 N.E.2d 814, 823–24. On appeal, we are therefore required to determine whether reasonable persons would be bound to reach a conclusion different from the Commission's determination on the evidence in the record.
>
> With this standard of review in mind we also note administrative decisions must be based on ascertainable standards to insure orderly and consistent action. *Podgor v. Indiana University,* (1978) Ind.App., [178 Ind.App. 245] 381 N.E.2d 1274. These standards should be stated with sufficient precision to provide fair warning of the criteria relevant to an administrative decision. *Id.* However, the standards need only be as specific as the circumstances permit considering the purpose to be accomplished. *Clarkson v. Dept. of Insurance,* (1981) Ind.App., 425 N.E.2d 203."

*Sullivan, supra* at 101.

It is true, as May claims, that an employee must be aware that his or her performance is deficient before such deficiency can be considered in an employment decision. This court, in *State ex rel. Dept. of Nat. Resources v. Lehman* (1978), 177 Ind.App. 112, 378 N.E.2d 31, recognized that evidence of actions which would later constitute misconduct, but did not constitute misconduct at the time they were done, did not support the employee's demotion.

Further, only evidence supporting the agency's stated reasons can be considered, as those are the grounds on which the decision was made. *See Voss v. Review Bd.* (1989), Ind.App., 533 N.E.2d 1020.

A close examination of the record reveals sufficient evidence to support the Director's decision. The evidence also demonstrates that May had been made aware that his performance was deficient and that he continued his deficient performance after having been put on notice.

The reasons Greenwalt stated in his letter to May for his demotion were his lack of urgency, adversarial attitude, lack of leadership, ineffective leadership, failure to set a good example, failure to meet deadlines, his failure to demonstrate sound management practices, and his failure to respond to requests to change his job performance.

May focuses on the meetings held in January and February, 1987, as the first notice to him that his performance was deficient, and claims that no evidence concerning his performance after those dates was introduced. May's focus is myopic. The Director did not decide, as May contends, that the meetings in early 1986 were his first notice that his performance was deficient. Rather, the Director observed that those meetings gave May the opportunity to address and detail his plans for improving his job performance, but that May was unresponsive.

May points to the evaluations he received in the two years previous to the year he was demoted as evidence that he was not informed his performance was unacceptable. *Record* at 1254–58. There is an appealing gloss to May's argument, as the

appraisal reports and the evaluation process provide employers with the opportunity to identify and correct unacceptable performance, as well as provide documentation for further personnel decisions. While we may not approve of DNR's failure to use the management tools at its disposal, an examination of the record demonstrates that May was aware the evaluations did not reflect DNR's actual assessment of his performance.

Greenwalt testified that he initially did not want to give May a satisfactory evaluation in 1985, but that, after a long discussion with North, during which North indicated he would express Greenwalt's dissatisfaction with May to him, Greenwalt approved the evaluation. *Record* at 1091. North indicated to Greenwalt that he had so informed May. *Record* at 1092, 1174. Greenwalt testified he specifically mentioned May's interpersonal relationships with other people in other divisions as one area of his dissatisfaction. *Record* at 1092. A trier of fact could reasonably conclude that this evidence supports DNR's contention May was aware DNR was dissatisfied with his performance and that his performance appraisal did not reflect DNR's true evaluation of him.

There was other evidence in the record that Greenwalt expressed his dissatisfaction with May's performance. *Record* at 1105, 1126, 1158, 1175, 1188. The record also shows that May had continuously been late in generating the lists of departmental projects (the priority lists) and that Greenwalt had expressed his dissatisfaction with May for several years. *Record* at 1095, 1129–30, 1187–88, 1192–93.

The record contains evidence supporting the other stated reasons for May's demotion, and it demonstrates May was aware his performance was deficient. Concerning May's poor management practices, Greenwalt testified he had expressed his dissatisfaction with May's attention to insignificant details, *record* at 1103, and that he had instructed May to delegate more of his work. *Record* at 1185. While May's performance initially improved, he later delegated less frequently. *Record* at 1104, 1141, 1178.

Greenwalt testified he had repeatedly expressed his desire for the Engineering Division to adopt a "service" mentality when dealing with other divisions, and that May had adopted an adversarial role with other divisions. *Record* at 1094–95. Greenwalt cited, as an example of May's adversarial attitude, May's interpretation of Ind.Code 4–13.6–5–4(b) (1988), which allows DNR to complete projects without having to resort to outside contractors if DNR estimates the cost will be less than $50,000 (hereinafter referred to as the $50,000 law).

When May estimated costs for projects submitted by the landholding division, he would use union wage scales while figuring labor costs. The landholding division thought that, because the DNR did not pay union scale, those labor costs were inflated, and therefore May's estimates were higher than they should be. May focuses on his interpretation of the $50,000 law as the main cause for his demotion, and claims that he was improperly demoted because his interpretation was correct.

Whether May's interpretation was correct is not an issue before us, nor is it particularly relevant to the resolution of this case. The record does not support May's allegation that his interpretation of the $50,000 law was a major reason for his demotion. *Record* at 1131. The record is replete with evidence of other factors considered in May's demotion, and this single example of May's adversarial attitude can hardly be considered a major factor.

Further, the fact that May's interpretation of the statute differed from other DNR employees' interpretation does not appear to have been a substantial factor. Rather, it was May's *attitude,* described by Greenwalt as a "watchdog" and "Byron May against the world" attitude, *record* at 1125 and 1094, that was unsatisfactory. Another example of May's adversarial attitude used by Greenwalt was May's problem with members of the Fish and Wildlife Division and an outside consulting firm. *Record* at 1140–41.

May's argument that his insistence that pit toilets in one project be handicapped accessible is similarly without merit. May asserts that another major factor in his demotion was his insistence that pit toilets be handicapped accessible according to his interpretation of state law. While Greenwalt referred to May's concentration on pit toilets as an example of his inappropriate attention to detail and his failure to consider "the big picture," *record* at 1153, the record does not disclose May's views concerning pit toilets were a significant consideration in the decision to demote him.

Another factor considered in the decision to demote May was his unwillingness to respond when he was told his performance was unsatisfactory and told to give recommendations on how he could do a better job. In two group meetings, in January and February of 1986, Greenwalt addressed the Engineering Division. Greenwalt testified:

> "We talked for some time then about a sense of urgency, about a service attitude that I wanted delivered from all my service divisions to include Engineering. I remember asking at the close of that that each and every person in the room and I made that as clear as I just said it, that each and every person in the room go back and do some soul searching about the way they were doing their job. To take a hard look around about how they interrelated with each other and with other people and to come back to me with recommendations on how we could better do the job."

*Record* at 1107.

Greenwalt made the same plea at the February meeting, *record* at 1110, and testified that he believed May understood that he was talking to him when he asked for recommendations. *Record* at 1112, 1175–76. Greenwalt testified May's only response was to criticize the placement of the United States flag in the room where the meetings were held. *Record* at 1110–11.

Greenwalt described his efforts at trying to improve May's performance as analogous "to punching a marshmallow, it's just kind of like that, you hit something and you try to make a correction and you turn around you feel like that that marshmallow is going to take that configuration and the minute you pull out of the marshmallow it takes its configuration right back and its [sic] business as usual." *Record* at 1099.

When reviewing the decision of an administrative agency, we cannot reweigh evidence or substitute our judgment for that of the administrative agency, and we must affirm if there is substantial evidence supporting the decision. *Paino, supra; Thomas, supra; Elkins, supra; Ramshead Corp., supra.* And there is substantial evidence here.

So we necessarily conclude that the Director's decision was not arbitrary and capricious and that the trial court properly affirmed May's demotion.

Judgment affirmed.

SHIELDS, P.J., and RATLIFF, C.J., concur.