**INDIANA DEPARTMENT OF PUBLIC WELFARE, Appellant–Defendant,**

**v.**

**Hazen PAYNE, Appellee–Plaintiff.**

No. 49A02–9105–CV–230.

Court of Appeals of Indiana, Second District.

May 26, 1992.

716

Linley E. Pearson, Atty. Gen., Gary L. Shaw, Wendy Stone Messer, Deputy Attys. Gen., Indianapolis, for appellant-defendant.

Scott R. Severns, Severns & Associates, Indianapolis, for appellee-plaintiff.

BUCHANAN, Judge.

## CASE SUMMARY

Defendant-appellee Indiana Department of Public Welfare (the Department)[1] appeals from the entry of summary judgment in favor of plaintiff-appellee Hazen Payne (Payne), claiming that the trial court erred when it concluded the Department was required to allow Payne to spend down his excess resources[2] to become eligible for Medicaid and when it concluded that certain property owned by Payne was exempt from consideration by the Department in determining Payne's Medicaid eligibility.

We affirm in part and reverse in part.

## FACTS

The facts most favorable to the trial court's decision reveal that Payne was a construction laborer living in Monroe County, Indiana. Payne was divorced and had custody of his fourteen year old daughter. In July, 1988, Payne became ill and was diagnosed as having leukemia. He was hospitalized at the Indiana University Medical Center in Indianapolis for most of the following five months. Payne had no health insurance and he had insufficient assets to pay the approximately $150,000 in medical expenses which accumulated during his hospitalization.

Payne applied for Medicaid benefits from the Monroe County Welfare Department and was determined to be disabled. The Department concluded that Payne was eligible for Medicaid benefits beginning in December, 1988, but decided that Payne owned resources in excess of the Department's financial eligibility requirements for the months from July through November, 1988, the time during which Payne incurred approximately $150,000 in medical expenses.

Payne requested an administrative hearing to challenge the denial of Medicaid benefits. Payne argued that the Department should not have included the values of a wooden wagon, a buggy, a non-motorized camper and a stock trailer when the Department calculated the value of his non-exempt assets in the determination of his Medicaid eligibility. Payne also asserted that he should have been allowed to spend down his excess resources to become eligible for Medicaid. The Department's hearing officer upheld the denial of benefits and the Department's board sustained the hearing officer's decision.

Payne sought judicial review of the Department's action. Payne moved for sum-

1. Effective January 1, 1992, Indiana restructured the state's public welfare bureaucracy. The Department became the Division of Family and Children which was charged with the administration and supervision of Indiana's public welfare activities. Ind.Code 12–1–2–3 (1991 Supp.).

2. The application of a Medicaid applicant's resources in excess of the Department's resource allowance, to outstanding medical expenses, in order to qualify for Medicaid, is referred to as a "resource spend-down."

mary judgment, and the trial court entered its findings of fact and conclusions of law on February 5, 1991. The trial court's order provided:

## "CONCLUSIONS OF LAW

13. The Medicaid Program was established in 1965 as Title XIX of the Social Security Act to provide federal financial assistance to states that choose to reimburse certain costs of medical treatment for needy persons.

14. States which participate in this Medicaid Program are obligated to abide by the requirement [sic] of Federal Medical Statute [sic] and Regulations.

15. Indiana has chosen to participate in the Medicaid Program.

16. Indiana has chosen to provide Medicaid under the § 209(b) option, which allows states to provide Medicaid assistance only to those individuals who meet the eligibility requirements of the state Medicaid plan which existed on January 1, 1972.

17. Under the § 209(b) option, Indiana's current Medicaid standards cannot be more restrictive than the standards which were in effect in Indiana on January 1, 1972. Also, the current Medicaid standards cannot be more liberal than the standards for the Supplemental Security Income (SSI) Program.

18. Certain kinds of personal property are exempt and are not counted in determining the value of a Medicaid applicant's assets.

19. Plaintiff's wooden wagon, buggy, are exempt household goods. Plaintiff's non-functional Gremlin and Cadillac automobiles were valued at $50 each.

20. Plaintiff's camper and stock trailer are exempt as income-producing property if it is shown, upon remand, that the income produced by such property was at least 6% of the equity value of such property.

21. Indiana's 1972 Medicaid state plan allowed applicants to become eligible for Medicaid by paying the amount by which the applicant's resources exceeded the resource limits for Medicaid towards the applicant's medical bills. Once the applicant so adjusted his or her excess resources, the applicant became eligible for Medicaid to pay the remainder of the medical bills. This is referred to as 'resource spend down.'

22. On April 1, 1984 the Indiana Department of Public Welfare rescinded its regulation which provided for eligibility after the spend down of excess resources. Under the regulations in effect since April 1, 1984, an individual is ineligible for Medicaid during any month in which his or her countable resources exceed the resource limit on the first day of the calendar month.

23. Since April 1, 1984 Indiana's eligibility requirements concerning resources have been more restrictive than those eligibility requirements which were in effect on January 1, 1972 insofar as they do not provide eligibility based on the spending down of excess resources.

24. Eligibility based upon the spending down of excess resources is not prohibited by the federal Medicaid statue [sic] and is consistent with the policy of the federal Medicaid Statute. Also, spending down of excess resources is not a provision which is more liberal than SSI.

25. Spending down of excess resources to become eligible for Medicaid is not prohibited by federal law.

26. Since spend down of excess resources was a part of Indiana's 1972 state plan and since such spend down is not prohibited by federal law, Indiana must allow Medicaid eligibility upon the spending down of excess resources.

27. It was contrary to law to deny Mr. Payne eligibility for Medicaid without providing him the opportunity to spend down his excess resources.

. . . . . .

## SUMMARY JUDGMENT

The Court being duly advised hereby adopts the above findings of fact and conclusions of law and enters the following judgment:

1. The decision of the Indiana Department of Public Welfare denying Hazen

Payne's application for Medicaid benefits is hereby reversed.

2. This cause is remanded to the Indiana Department of Public Welfare for further proceedings consistent with this opinion."

*Record* at 180–83.

## ISSUES

1. Whether the trial court erred when it concluded that the Department was required to allow Medicaid eligibility upon the spending down of excess resources?

2. Whether the trial court erred when it determined that Payne's wooden wagon, buggy, camper and stock trailer were exempt property?

## DECISION

*ISSUE ONE*—Did the trial court err when it decided the Department must allow a resource spend-down?

*PARTIES' CONTENTIONS*—The Department argues that the trial court impermissibly reweighed the evidence when it concluded the Department's 1972 standards permitted a resource spend-down and also claims that its resource limit has been judicially approved. Payne responds that the issue concerning the 1972 standards is a question of law which the trial court properly decided and asserts that a resource spend-down in Indiana is required by federal law.

*CONCLUSION*—The Department is required to permit a spend-down of excess resources.

Resolution of this issue requires examination of an intricate tapestry of statutes and regulations woven by the federal government and the State of Indiana. Finding no Indiana authority on point, we turn to other jurisdictions for guidance.

We begin by reviewing the broad Medicaid statutory scheme, focusing on the provisions relevant to the resolution of our inquiry. We then consider Indiana's regulatory structure in light of those provisions, as well as the Department's arguments, and reflect upon decisions from other jurisdictions which have pondered similar questions.

### I. Background

Medicaid was established in 1965 as Title XIX of the Social Security Act (the Act), 79 Stat. 343, as amended, 42 U.S.C. § 1396 *et seq.* (1982). It was enacted to provide medical assistance to needy individuals with income and available resources insufficient to meet the costs of necessary medical care and services. The federal government shares the costs of Medicaid with the states that elect to participate in the program, and the states must comply with the requirements imposed by the Act and by the Secretary of Health and Human Services. *See Atkins v. Rivera* (1986), 477 U.S. 154, 106 S.Ct. 2456, 91 L.Ed.2d 131; *Schweiker v. Gray Panthers* (1981), 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460.

When it was initially enacted, Medicaid required participating states to provide medical assistance to "categorically needy" individuals. The categorically needy were those individuals who received payments from any one of four different welfare programs established in the Act, which provided public assistance to the aged, blind, disabled and families with dependent children.[3]

The states were also permitted to offer Medicaid benefits to "medically needy" individuals, which included individuals who would have been eligible for aid under one of the programs, who were unable to pay for medical expenses, but whose incomes were too large to qualify for public assistance. *Id.*

In 1972, the United States Congress replaced three of those four welfare programs with a new program: Supplemental Security Income for the Aged, Blind and Disabled, 42 U.S.C. § 1381 *et seq.* (1982) [hereinafter referred to as SSI]. Under

---

3. The programs were: Old Age Assistance, 42 U.S.C. § 301 *et seq.* (1970); Aid to Families with Dependent Children (AFDC), § 601 *et seq.;* Aid to the Blind, § 1201 *et seq.;* and Aid to the Permanently and Totally Disabled, § 1351 *et seq. See also* 42 U.S.C. §§ 1381–1385 (1970). *See Gray Panthers, supra.*

SSI, the federal government assumed responsibility for the funding and the setting of standards for the new program. In some states the number of individuals eligible for SSI assistance was considerably larger than the number who were eligible under the previous state-run programs. *See Gray Panthers, supra.*

Because Congress retained the requirement that states participating in Medicaid must provide medical assistance to the categorically needy (now all those individuals who received SSI assistance), Congress was concerned that states would withdraw from Medicaid participation rather than expand their Medicaid coverage for the newly eligible categorically needy individuals. To prevent the implementation of SSI from

discouraging states' participation in Medicaid, Congress enacted the "§ 209(b) option" which allowed states to elect to provide Medicaid benefits *only* to those individuals who would have been eligible under the state's Medicaid plan in effect on January 1, 1972.[4] States that chose to offer Medicaid benefits to all individuals receiving SSI assistance are referred to as "SSI states" and those exercising the § 209(b) option are referred to as "§ 209(b) states." *See Gray Panthers, supra.* Indiana is a § 209(b) state.[5] *Gray Panthers, supra* at 39 n. 6, 101 S.Ct. at 2638 n. 6; *Synesael v. Ling* (7th Cir.1982), 691 F.2d 1213; Ind.Code 12–1–7–14.9(a)(4) (1988).[6]

The essence of the § 209(b) option is to allow states the choice of using their more

**4.** The § 209(b) option, codified at 42 U.S.C. § 1396a(f), originally provided:

"Notwithstanding any other provision of this subchapter, except as provided in subsection (e) of this section, *no State* not eligible to participate in the State plan program established under sub chapter XVI of this chapter *shall be required to provide medical assistance* to any aged, blind, or disabled individual (within the meaning of sub chapter XVI of this chapter) for any month *unless such State* would be (or *would have been) required to provide medical assistance to such individual* for such month *had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect* in such month, *except that for this purpose any such individual shall be deemed eligible for medical assistance under such State plan if* (in addition to meeting such other requirements as are or may be imposed under the State plan) *the income of any such individual* as determined in accordance with section 1396b(f) of this title (*after deducting* any supplemental security income payment and State supplementary payment made with respect to such individual, and *incurred expenses for medical care* as recognized under State law) *is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972.* In States which provide medical assistance to individuals pursuant to clause (10)(C) of subsection (a) of this section, an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered an individual eligible for medical assistance under clause (10)(A) of that subsection if that individual is, or is eligible to be (1) an individual with respect to whom there is payable a State supplementary payment on the basis of which

similarly situated individuals are eligible to receive medical assistance equal in amount, duration, and scope to that provided to individuals eligible under clause (10)(A), or (2) an eligible individual or eligible spouse, as defined in subchapter XVI of this chapter, with respect to whom supplemental security income benefits are payable; otherwise that individual shall be considered to be an individual eligible for medical assistance under clause (10)(C) of that subsection. *In States which do not provide medical assistance to individuals pursuant to clause (10)(C) of that subsection, an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered an individual eligible for medical assistance under Clause (10)(A) of that subsection.*"

(Emphasis supplied). This provision has been amended and currently includes other exceptions which are not relevant to our decision.

**5.** After the enactment of the SSI restructuring, states were still given the option of providing coverage to medically needy individuals. Indiana, however, does not provide such optional Medicaid coverage to medically needy individuals. *See Mattingly v. Heckler* (7th Cir.1986), 784 F.2d 258, 262; *Hayes v. Stanton* (7th Cir. 1975), 512 F.2d 133, 137–38 n. 5; *see generally* Ind.Code 12–1–7–14.9 (1988); IC 12–1–7–14.4 (1991 Supp.). The distinction between Indiana and other § 209(b) states providing optional coverage to medically needy individuals will become relevant when we consider decisions from other jurisdictions.

**6.** IC 12–1–7–14.9 was repealed and recodified as IC 12–1–7–14.4, effective July 1, 1991, which did not affect Indiana's § 209(b) election.

restrictive 1972 Medicaid eligibility standards rather than the more generous SSI eligibility standards. States participating in Medicaid are required to adopt reasonable eligibility standards for Medicaid applicants, considering the income and resources available to the applicant. 42 U.S.C. § 1396a(a)(17). However, under the § 209(b) option, a state's Medicaid eligibility requirements may be no more restrictive than those in effect on January 1, 1972.[7] *See Brogan v. Miller* (N.D.Ill.1982), 537 F.Supp. 139; 42 C.F.R. § 435.121(c)[8] [hereinafter referred to as the Federal Restriction Regulation]. Thus, if an individual would have been eligible for Medicaid under the state's plan in effect on January 1, 1972, the state is required to provide Medicaid benefits to that individual. This prohibition against more restrictive criteria is the basis of our decision.

The Department administers the Medicaid program in Indiana, with county welfare departments acting as its agents and under its supervision. I.C. 12–1–7–16 (1991 Supp.). The Department is to adopt any procedures or rules required by the Social Security Act. *Id.*

## II. Application

The controversy concerning Payne's Medicaid eligibility centers on the Department's regulations relating to the evaluation of his resources and the methodology employed by the Department when it decided his eligibility. When Payne applied for Medicaid, the Department applied its resource limitation regulation, 470 IAC 9.1– 3–17(a) (1988) [hereinafter referred to as the *Current Resource Rule*],[9] which provided, in pertinent part:

"An applicant or recipient is ineligible for medical assistance for any month in which the total equity value of all nonexempt resources exceeds the applicable limitation, set forth below, on the first day of the month:

(1) $1,500 for the applicant or recipient, including the amount determined in (b) below, if applicable; or

(2) $2,250 for the applicant or recipient and his spouse."

Because of the prohibition against more restrictive criteria, we must determine whether this regulation is more restrictive than the Department's 1972 resource limitation. The features of the Current Resource Rule most pertinent to our decision are 1) its provision that resources are to be evaluated as of the first day of the month, and 2) the absence of a provision allowing applicants to spend down excess resources to become eligible for Medicaid.

Payne was denied Medicaid benefits because he possessed assets in excess of the applicable $1,500 limit. *Record* at 8. The Department calculated that Payne's owned excess resources in the following amounts: July, 1988—$1,232.52; August, 1988—$1,173.34; September, 1988—$1,555.44; October, 1988—$230.84; and November, 1988—$48.94; for a total of $4,241.08 in excess resources. *Record* at 6. During this time period, Payne incurred medical expenses of $149,968.36. *Record* at 187.

---

**7.** The prohibition against more restrictive requirements arises from that portion of § 209(b) which provides "no State ... shall be *required* to provide medical assistance ... *unless* such State would be ... *required* to provide medical assistance ... had its plan ... in effect on January 1, 1972, been in effect...." 42 U.S.C. § 1396a(f) (emphasis supplied).

**8.** 42 C.F.R. § 435.121(c) provides, in pertinent part:

"(c) *Special requirements.* If an agency uses more restrictive requirements under this section—

(1) Each requirement may be no more restrictive than that in effect under the State's Medicaid plan on January 1, 1972, and no more liberal than that applied under SSI...."

The prohibition against more liberal requirements was effectively nullified with respect to income and resource eligibility criteria by the enactment of 42 U.S.C. § 1396a(r)(2), which explicitly allowed § 209(b) states to use more liberal resource and income methodologies than those used in SSI states. *See Mowbray v. Kozlowski* (4th Cir.1990), 914 F.2d 593; *Emerson v. Wynia* (D.Minn.1991), 754 F.Supp. 705.

**9.** This provision was amended in 1989, but the changes are not relevant to Payne's circumstances or our decision. After the restructuring of Indiana's public welfare bureaucracy, the Current Resource Rule was transferred to 405 IAC 2–3–15 effective January 1, 1992.

Payne argued, and the trial court agreed, that he should be allowed to apply his $4,241.08 in excess resources to his medical expenses and become eligible for Medicaid coverage for the remaining $145,727.28 unpaid medical expenses. The trial court determined that because Indiana permitted Medicaid applicants to spend down excess resources to become eligible for Medicaid under the state's plan in effect on January 1, 1972, and because § 209(b) prohibits Indiana from using any eligibility criteria more restrictive than those used on January 1, 1972, the Department was required to allow Payne to spend down his excess resources to become eligible for Medicaid.

### III. State Law Arguments

The Department first argues that the Current Resource Rule is based on IC 12–1–7–18.5(a) (1988) [hereinafter referred to as the State Resource Statute], and claims that this statute does not require a resource spend-down. The State Resource Statute provided: [10]

"An applicant for, or recipient of, medical assistance, is ineligible for that assistance if the total cash value of money, stock, bonds and life insurance owned by:

(1) the applicant or recipient exceeds fifteen hundred dollars ($1,500), in the case of medical assistance to the aged, blind, or disabled.

(2) the applicant, or recipient, and his spouse exceeds two thousand two hundred fifty dollars ($2,250), in the case of medical assistance to the aged, blind, or disabled."

A plain reading of this statute demonstrates that the Current Resource Rule is not based on this provision. The Current Resource Rule encompasses *all* of an applicant's nonexempt resources, including personal property. *See* 470 IAC 9.1–3–16 (now 405 IAC 2–3–14). The State Resources Statute, however, concerns only the cash value of the applicant's money, stocks, bonds and life insurance, and therefore

does not sanction the Current Resource Rule.[11] Further, the State Resource Statute, while not requiring a resource spend-down, does not *prohibit* a spend-down, and a resource spend-down would be entirely consistent with its provisions.

The Department also asserts that the trial court's order is inconsistent with decisions of this court which have approved the $1,500 resource limitation and the Current Resource Rule's first-day-of-the-month provision. In *Glaser v. Dept. of Pub. Welfare* (1987), Ind.App., 512 N.E.2d 1128, *trans. denied*, we considered the provision in the Current Resource Rule's previous incarnation (470 IAC 9.1–3–1, which was repealed effective February 1, 1987, and which was, for our purposes, identical to the Current Resource Rule) which provided that an applicant's resources would be evaluated as of the first day of the month for which the applicant was seeking Medicaid. We concluded the Department's application of the rule was reasonable.

In *Stockton v. Dept. of Pub. Welfare* (1989), Ind.App., 533 N.E.2d 148, we examined both the $1,500 limitation of the Current Resource Rule's predecessor as well as the first-day-of-the-month provision. We determined that the rule was properly promulgated, that it was reasonable, and that it was properly applied. No issue concerning a resource spend-down or the state's plan in effect on January 1, 1972, was raised in either *Glaser* or *Stockton*.

■ Contrary to the Department's position, a resource spend-down is not inconsistent with the $1,500 limitation or the first-day-of-the-month rule. Using a spend-down, the applicant's resources would still be reduced to the $1,500 limit and the Department would still value the applicant's resources as of the first day of the month. Only the Department's current application of the rule would be affected by a resource spend-down.

---

**10.** The State Resource Statute was amended in 1991, but the changes are not relevant to Payne's circumstances or our decision.

**11.** The Current Resource Rule is authorized by IC 12–1–7–16, which directs the Department to comply with the federal statutes, including the provisions of 42 U.S.C. § 1396a(a)(17) concerning the evaluation of an applicant's resources.

■ The Department's primary argument against the trial court's judgment is its claim that the trial court reweighed the evidence and subjected its actions to a *de novo* review concerning the content of its plan in effect on January 1, 1972. While it is true that Ind.Code 4–21.5–5–11 prohibits a *de novo* action by the trial court, that prohibition applies only to questions of fact, not questions of law. *See Stockton, supra.* An administrative agency's conclusions of law are not entitled to the same deference given to its findings of fact. *Board of Trustees of P.E.R.F. v. Miller* (1988), Ind., 519 N.E.2d 732; *Hamilton Co. Dept. of Pub. Welfare v. Smith* (1991), Ind.App., 567 N.E.2d 165.

The construction of the Department's regulations in effect on January 1, 1972 was a question of law properly considered by the trial court. The trial court correctly concluded that the Department allowed a resource spend-down in its plan in effect on January 1, 1972. The state's plan in effect on January 1, 1972 contained the following regulatory provisions:

> "(c) Possession of intangible personal property with an available liquid cash value in excess of the standard resource allowance shall render an applicant ineligible for assistance, and *utilization of some of the resources down to the amount of the standard resource allowance is necessary before the applicant can be found eligible.*
>
> (d) Possession of intangible personal property with an available cash value which has increased to be in excess of the standard resource allowance shall not make a recipient ineligible for assistance providing the recipient is willing to make the necessary adjustments and taken immediate steps to do so."

Indiana State Department of Public Welfare, Regulation 2–114 (emphasis supplied), *Burns' Indiana Administrative Rules and Regulations, Annotated* § (52–1206)–2 (1975 Supp), effective August 2, 1971 [hereinafter referred to as the *1972 Resource Rule*]. This regulation is the focal point of our analysis.

Payne contends that the 1972 Resource Rule allowed a Medicaid applicant to spend down excess resources to become eligible for medical assistance. The Department responds that the language is inconclusive. Our reading of the rule supports the trial court's determination that the Department's 1972 plan allowed a resource spend-down.

The 1972 Resource Rule provides that an applicant "can be found eligible" for assistance once the applicant's resources have been utilized "down to the amount of the standard resource allowance." This does not suggest that an applicant would be denied medical assistance for the month requested and that the applicant would have to reapply after the excess resources were spent down, which is how the Department would have us read the regulation.

■ The Department's Medicaid Manual in effect until 1984 explicitly allowed a resource spend-down. *See* 470 IAC 9–3–2(22.2) (1979); 470 IAC 9–4–3(12) (1979). Construing the 1972 Resource Rule as authorizing a resource spend-down, is consistent with the eventual development of the Department's Medicaid Manual. From our reading of the 1972 Resource Rule, we conclude that the State's plan in effect on January 1, 1972, allowed applicants to spend down excess resources to become eligible for Medicaid benefits. Because Payne would have been allowed to spend down his excess resources to become eligible for Medicaid under the plan in effect on January 1, 1972, the Department's Current Resource Rule is *more restrictive* than its 1972 Resource Rule.

### IV. Federal Law Arguments

■ Two federal district courts have considered the same questions that are before us. These courts reached opposite conclusions, and both Payne and the Department ask us to follow the decision that supports their respective position. The Department champions *Roloff v. Sullivan* (N.D.Ind.1991), 772 F.Supp. 1083, while Payne favors *Foley v. Suter* (N.D.Ill.1988), No. 83 C 4736, Medicare & Medicaid Guide (CCH) ¶ 37,695, 1988 WL 235571.

The court in *Roloff* considered a resource spend-down in relation to claims that the first-day-of-the-month aspect of the Current Resource Rule violated the prohibition against using criteria more restrictive than those used in the state's plan in effect on January 1, 1972. The court characterized a resource spend-down as the antithesis of the first-day-of-the-month rule.

In *Roloff*, it was determined that the Department was not required to allow Medicaid applicants to spend down their excess resources to become eligible for benefits. That determination was based on the following conclusion:

"[I]t does not matter whether Indiana had a first day of the month rule as of January 1, 1972, because under the § 209(b) option, a state could either retain eligibility criteria as restrictive as that in 1972 *or* adopt federal SSI standards. Since the first day or [sic] the month rule is an SSI standard, 20 C.F.R. § 416.1207(a), Indiana's option for that standard need not be measured against the state's procedures in 1972."

*Roloff, supra* at 1090 (emphasis in original).

In the other pertinent decision, the court in *Foley* considered Illinois' Medicaid eligibility requirements, and determined that the Illinois Department of Public Aid was required by its 1972 state plan to allow applicants to use a resource spend-down. It concluded that, if a state's 1972 eligibility requirements are not invalid, the state may not impose more restrictive eligibility criteria, even though those more restrictive criteria are also permissible under SSI.

We conclude that the relevant analysis in *Foley* is superior to the reasoning of *Roloff*. We cannot agree with the conclusion in *Roloff* that a resource spend-down cannot be used in conjunction with a first-day-of-the-month rule. We have already concluded that a resource spend-down is not inconsistent with the first-day-of-the-month aspects of the Current Resource Rule, as an applicant's resources would still be evaluated as of the first day of the month. It is more accurate to describe a resource spend-down as an *additional* eligibility criterion, not an *alternate* criterion to the first-day-of-the-month rule.

The *Roloff* court essentially decided that a § 209(b) state may use more restrictive criteria than it used in 1972 so long as the state's 1972 criteria are not also *required* by SSI standards. This conclusion seems to be contrary to the provision of § 209(b) which mandates that if a § 209(b) state would have been required to provide medical assistance under its 1972 plan, it is required to provide that assistance under its current plan.

Our conclusion that a resource spend-down is an additional eligibility criterion that can be used along with a first-day-of-the-month rule is supported by the decisions from a number of jurisdictions that § 209(b) states are permitted to use resource spend-downs. *Harriman v. Comm'r, Maine Dept. of Human Servs.* (D.Me.1990), No. 90–0046–B, Medicare & Medicaid Guide (CCH) ¶ 39,089, 1990 WL 284515; *Westmiller v. Sullivan* (W.D.N.Y. 1990), 729 F.Supp. 260; *Foley, supra; Walter O. Boswell Memorial Hosp., Inc. v. Yavapai County* (1986), Ariz.App., 148 Ariz. 385, 714 P.2d 878; *Hession v. Ill. Dept. of Pub. Aid* (1989), 129 Ill.2d 535, 136 Ill.Dec. 65, 544 N.E.2d 751; *Haley v. Comm'r of Pub. Welfare* (1985), 394 Mass. 466, 476 N.E.2d 572; *Kempson v. N.C. Dept. of Human Resources* (1990), 100 N.C.App. 482, 397 S.E.2d 314.

The Department attempts to distinguish the decision in *Foley* by claiming that because Illinois has chosen to provide Medicaid coverage to medically needy individuals, and Indiana has not, the analysis in *Foley* is inapplicable in Indiana, relying on *Roloff* and *Gandenberg v. Barry* (S.D.Ohio 1988), 687 F.Supp. 346.

The court in *Gandenberg* considered a claim that Ohio's Medicaid eligibility requirements should include a resource spend-down. The plaintiff relied upon decisions which directly linked the resource spend-down requirement to that states' medically needy programs. Because Ohio, like Indiana, does not provide optional Medicaid coverage for medically needy individuals, the court in *Gandenberg* rejected

the contention that Ohio was required by the federal provisions relating to medically needy individuals to allow a resource spend-down. However, the question before us was not considered in *Gandenberg*, as the court remarked: "This Court notes that plaintiffs concede that *Ohio has never used a resource spend down prior to August of 1980* (Doc. No. 46)." *Gandenberg, supra* at 350 (emphasis supplied).

The court in *Roloff*, following *Gandenberg*, concluded that decisions which linked a resource spend-down to medically needy programs were not relevant in Indiana. While it is true that Indiana, like Ohio, is not required to allow a resource spend-down due to regulations relating to medical needy programs, it does not follow that the relevant analysis used in *Foley* is also inapplicable in Indiana. The status of Illinois' medically needy program was not pertinent to the conclusion in *Foley* that Illinois could not use more restrictive criteria than it used in 1972. Payne has not asserted, as did the plaintiffs in *Gandenberg*, that the Department is required to allow a resource spend-down because of regulations relating to medically needy applicants.

The question we consider—a resource spend-down in light of the state's 1972 plan—was not present in *Gandenberg*. We therefore do not agree with the Department's assertion that the relevant analysis of *Foley* is inapplicable. On the whole, we conclude that the analysis in *Foley* is more consistent with the provisions of § 209(b) and the Federal Restriction Regulation than the analysis in *Roloff*.

## V. Conclusion

The Department's Medicaid eligibility plan in effect on January 1, 1972, allowed Medicaid applicants to spend down their excess resources to become eligible for Medicaid. The Department may not use more restrictive eligibility criteria than it used under its plan in effect on January 1, 1972, so it must allow Payne to spend down his excess resources to become eligible for Medicaid. This conclusion, while it may not be "as clear as is the summer's sun," [12]

12. Shakespeare, *Henry V,* Act 1, sc. 2.

nevertheless is supported by the better reasoning of the decided cases and is in keeping with legislative intent.

*ISSUE TWO*—Did the trial court err when it concluded that Payne's wagon, buggy, camper and stock trailer were exempt property?

*PARTIES' CONTENTIONS*—The Department claims that the trial court impermissibly reweighed the evidence when it reviewed Payne's resources. Payne replies that the trial court properly determined his exemptions.

*CONCLUSION*—The trial court erred when it determined the exemption status of Payne's property.

Having decided that Payne is allowed to spend down his excess resources to become eligible for Medicaid, we now must determine the extent to which his assets exceeded the Current Resource Rule's $1,500 limit.

The Department counted, as part of Payne's non-exempt resources, the value of Payne's wooden wagon, a horse-drawn buggy, a camper and a horse trailer. The trial court determined that the wagon and buggy were exempt as household goods, that the camper and trailer were income producing property, and ordered the Department to determine whether the camper and trailer were eligible for exclusion under the Department's regulations relating to income producing property.

The Current Resource Rule also regulates the classification of an applicant's resources, and, at the time Payne applied for Medicaid, provided in part:

"(c) In addition to that property required to be excluded by federal statute or regulation the following property is exempt from consideration:

(1) all household goods and personal effects ...

. . . . .

(e) Property, except liquid assets, not exempt under subsection (c) or (d), is subject to the following consideration:

(1) $6,000 of the equity in property is exempt if such property is producing a net annual return of at least six percent (6%) of the excluded equity."

470 IAC 9.1–3–17 (1988) [these portions of the Current Resource Rule will hereinafter be referred to as the Household Goods Rule and the 6%/$6000 Rule, respectively].[13]

When reviewing an administrative decision, we are limited to determining whether the agency's action was arbitrary, capricious, an abuse of discretion, in excess of statutory authority or is not supported by substantial evidence. *State Bd. of Tax Comm'rs v. Jewell Grain Co.* (1990), Ind., 556 N.E.2d 920; *May v. Dept. of Natural Resources* (1991), Ind.App., 565 N.E.2d 367, *trans. denied.* An arbitrary and capricious act is one which is willful and unreasonable, without consideration and regard for the facts and circumstances of the case, and one without some basis which would lead a reasonable and honest person to the same conclusion. *Jewell Grain Co., supra.* We will reverse only if the evidence, when viewed as a whole, establishes that the agency's conclusions are clearly erroneous. *City of Indianapolis v. Hargis* (1992), Ind., 588 N.E.2d 496.

To support its decision that Payne's wagon and buggy were not household goods, the Department refers to two portions of Payne's testimony describing his use of the wagon and buggy:

"Severns [Payne's attorney]: Could you tell us about those animals?

H. Payne Well, they're mine and my daughters; they're *recreational.* I use the mules, like I say, to ... I call it *recreation.* A lot of people say it would be work, but I enjoy going out and· hooking them up and hauling firewood in, you know....

Severns: So you'd hook the mules up to the wagon?

Payne: Uh, huh.

. . . . .

Severns: ... what about the buggy? What's the buggy for?

Payne: Just to get out in it on Sunday and go down the road.

Severns: Okay. Behind the mules?

Payne: Yes.

Severns: Okay.

Payne: Just kind of a conversation piece, you know. People stop, takes pictures, and I enjoy that."

*Record* at 61, 68 (emphasis supplied).

From Payne's own lips, then, it appears that there is a reasonable basis for the Department's determination that his wagon and buggy were recreational vehicles. Payne has not argued that recreational vehicles are exempt household goods, rather he simply points to the definition of household goods found in the federal regulations, 20 C.F.R. § 416.1216(a), and argues that under the federal definition his wagon and buggy *could* be construed as household goods.

 We cannot reweigh the evidence or substitute our judgment for that of the Department, and we must affirm the Department's factual determination unless it conclusively appears that the evidence upon which the decision was made was devoid of probative value or so proportionately inadequate that the finding could not rest on a rational basis. *May, supra.* Because there is evidence in the record which supports the Department's conclusion that Payne's wagon and buggy were nonexempt recreational vehicles, the trial court erred when it reclassified them as exempt household goods.[14]

 We come to a similar conclusion with respect to the trial court's classification of Payne's camper and horse trailer. The trial court concluded that the camper and trailer were income producing property

---

**13.** The 6%/$6000 provision of 470 IAC 9.1–3–17(e) is no longer a part of the Current Resource Rule. 405 IAC 2–3–15.

**14.** As there is nothing in the entire record to indicate that the Department has adopted any regulations defining what constitutes exempt

"household goods and personal effects," or that it should have done so, our decision of necessity is limited to whether the Department acted arbitrarily or capriciously. *See Jewell Grain Co., supra; May, supra.*

and ordered the Department to determine whether they meet the requirements of the 6%/$6000 Rule with respect to the relationship of the income generated by the property and Payne's equity in the property.

The camper and trailer were used by Payne's fourteen year-old daughter to transport animals to the county fair. Payne's daughter participated in a local 4H club, and she sold animals at the county fair. She slept in the camper overnight during the fair while she tended her animals. Any income generated by these activities was set aside for her future education. *Record* at 63–68.

The Department decided that because the property did not generate income to Payne, it was not properly considered income producing property within the meaning of the 6%/$6000 Rule. At the administrative hearing, the administrative law judge observed that Payne did not include the value of any of his daughter's assets in the calculation of his assets because the accounts are listed in her name. *Record* at 65.

Payne argues that because he has a duty to support his daughter, the property that he owns which is used to fulfill that support obligation should be considered as producing an income which benefits him. While we do not doubt that Payne receives some benefit from the income his daughter generates with his property, we cannot agree with Payne's construction of the 6%/$6000 Rule.

A reading of the rule is not helpful, as it merely describes as exempt property which produces a return of at least six percent of its excluded equity value. It does not specify for whom that return must be produced. Finding no case law on point in Indiana, or any other jurisdiction, we turn to the federal regulations for guidance.

The pertinent federal regulation provides, in part: "We will exclude as essential to self-support up to $6,000 of an individual's equity in income-producing property if it produces a net annual income *to the individual* of at least 6 percent of the excluded equity." 20 C.F.R. § 416.1222(a) (emphasis supplied).

The regulation contemplates that the exempt property produce income "to the individual" *seeking Medicaid.* Given this explicit indication of the type of property that is to be excluded, we conclude that the trial court erred when it determined Payne's camper and horse trailer were exempt as income producing property.

The trial court's determination of the exemption status of Payne's wagon, buggy, camper and trailer is reversed, and in all other respects the judgment is affirmed.

SHIELDS and RUCKER, JJ., concur.